Filed 2/23/21  K.M. v. Superior Court CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

K.M.,

      Petitioner,

      v.

THE SUPERIOR COURT OF SANTA CLARA COUNTY,

      Respondent;

SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,

      Real Party in Interest.

H048611
(Santa Clara County
Super. Ct. No. 115JD023392)

Petitioner K.M. (mother) is the mother of G.N. (minor), who is a dependent of the Santa Clara County Juvenile Court.  Mother petitions for extraordinary writ relief from a juvenile court order that, following a contested hearing, granted minor's counsel's petition under Welfare and Institutions Code section 388[1] to terminate mother's visitation with minor and set a hearing under section 366.26.  Prior to the contested hearing on the

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

section 388 petition, mother had sought to have minor testify by issuing a subpoena. Minor's counsel filed a motion to quash that subpoena, which motion the juvenile court granted.

In her writ petition, mother contends the juvenile court abused its discretion in granting the section 388 petition and ending visitation. She further claims the juvenile court erred by granting the motion to quash. For the reasons set forth below, we reject these claims and deny mother's writ petition.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Dependency Proceedings from 2015 through 2019*

We have carefully reviewed the voluminous record on appeal; we set forth here only the facts relevant to mother's writ petition. Minor, who is now 15 years old, has been a dependent of the Santa Clara County Superior Court since she was nine years old. The record reflects that mother suffers from substance abuse and mental health difficulties.

1. <u>Early Dependency Proceedings</u>

In August 2015, when minor was nine years old, San Jose police arrested mother for child endangerment and being under the influence of a controlled substance. Minor was placed into protective custody. Shortly thereafter, the Santa Clara County Department of Family and Children's Services (Department) filed a juvenile dependency petition. In September 2015, the juvenile court sustained an amended juvenile dependency petition and found that minor came within section 300, subdivision (b). The juvenile court ordered minor removed from mother's care.

In September 2016, approximately one year after dependency proceedings began, the juvenile court ordered minor returned to mother's care. A few months later, around December 2016, mother relapsed. The juvenile court allowed minor to remain with mother under continued court supervision. However, mother continued to abuse unlawful drugs and disengaged with family maintenance services.

2

In April 2017, by order of the juvenile court, the Department removed minor from mother's residence. The Department simultaneously filed a section 387 petition. On May 8, 2017, the juvenile court sustained the petition and ordered that minor be removed from mother and placed in a foster home.

After minor's removal in April 2017, minor was not returned to mother's care. Between the date of minor's removal and the issuance of the orders challenged here, mother tested positive for drugs, was homeless for certain periods of time, and generally suffered from emotional instability.

In May 2017, the juvenile court terminated family reunification services. At the May 2017 hearing, in accordance with the Department's recommendation, the juvenile court ordered a planned permanent living arrangement as the permanent plan, rather than adoption or legal guardianship. The juvenile court found that a section 366.26 hearing was not at that time in minor's best interest. This planned permanent living arrangement has remained in effect to the present.

2. Visitation Following Termination of Reunification Services

After reunification services were terminated, mother continued visitation with minor. Over time, the nature and amount of visitation between mother and minor changed.

In November 2017, the juvenile court held an initial post-permanency review hearing under section 366.3 at which it ordered a continued permanent plan of long-term foster care for minor with a permanent plan of either legal guardianship or placement with a fit and willing relative. The juvenile court ordered that mother have visitation with minor at least once per week.

In a November 2018 status review report by the Department, the reporting social worker Sabrena Stice stated that, in the last reporting period, visits between minor and mother "moved from supervised to monitored to unsupervised" and that minor "now has unsupervised phone calls with her mother." Stice observed that minor was "not exuding

3

the same level of confidence, energy and calm as previously" and also opined that mother and minor had an "enmeshed/dysfunctional relationship."

Also in the November 2018 report, Stice described a conversation she had had with mother's probation officer, in which the probation officer told Stice that mother had been under the influence of drugs in the probation officer's presence, never provided a clean drug test, was "assuredly under the influence when with her child in the community," and that mother had relayed to the probation officer conversations mother had with minor about sex that "did not sound appropriate" to the probation officer. Based on this information from the probation officer, Stice felt that unsupervised visits were no longer appropriate.

In a May 2019 status review report, Stice stated that minor (who was then 13 years old) reported feeling depressed and continued to struggle emotionally. Stice reported that mother had also "bombarded" minor with text messages and that minor had "temporarily blocked her mother's communication for peace of mind." Stice also observed that some of her communications "put down" minor and made her feel "unattractive and cheap." Mother "put down [minor]'s choice in clothing, friends, and is angry [minor] is no longer practicing her religion and blames the care provider's [sic]."

On February 7, 2019, minor's "team" discussed the text messages and videos minor had been receiving from mother and the effects they were having on minor's emotional health. Stice noted that "[minor] is increasingly withdrawn, is having increased self-harming behaviors and is not able [to] focus in school." On February 14, 2019, the text messages and videos minor had been receiving from mother were also discussed during a child family team meeting at which mother was present. Stice stated that after this meeting minor began receiving text messages from the cell phone of mother's partner (her then-boyfriend and who is later referred to in the record before us as her fiancé) that contained similar language.

4

In May 2019, the juvenile court ordered mother to have supervised visits a minimum of one time per month for two hours, with each visit to occur at an approved visitation center. The visitation order allowed mother to exchange text messages with minor and provided that the foster parents could review the texts at their discretion. The visitation order also allowed one weekly, unsupervised 20-minute phone call between mother and minor.

In November 2019, the juvenile court confirmed the prior May 2019 visitation order, including the terms allowing texting between mother and minor.

B. *April 28 and June 26, 2020 Reports and Minor's Section 388 Petition*

In April 2020,[2] the Department filed a status review report in connection with the scheduled section 366.3 post-permanency plan review hearing. We refer to this Department report, as did the juvenile court, as the April 28 report. In the April 28 report, the reporting social worker Stice stated that, on February 11, "during a monthly contact, an incident with the mother was brought to [Stice's] attention." Specifically, four days before, on February 7, the mother had "threatened" minor by "stating she planned to cease visitation" with minor. When her "guilt tactics" did not work, mother and her partner "began calling the child names and demeaning her" and continued to harass minor in the following days. "When one phone number was blocked the mother would create another phone number and continue texting and calling the youth."

Stice was "shown several text messages, one [of] which included a statement about the mother insulting a person who had committed suicide" and "the discussion was disturbing to all involved." According to Stice, she "shared her perspective" with minor and "the mandate to establish and maintain safety," but minor did not wish Stice to pursue a detriment order at the time. Minor stated she "needed time to think" and it was decided she would use her therapist and wraparound supports to help process the

_____

[2] All further dates are in 2020 unless otherwise indicated.

5

incidents and make decisions, "as well as tak[e] a break (step[] back) from her mother, as a part of her safety plan."

According to Stice, on February 13, Stice contacted mother (via phone, text, e-mail, and the group chat the team had been using to arrange visitation) to let her know that the content of mother's communications with minor and their effects on minor were at issue and that she would place the visits "on hold" until further notice. Mother did not contact Stice until April 3, when mother inquired whether a child family team meeting had been arranged " 'to discuss the communication issues.' " Stice responded that she had not set up a meeting. Stice stated in the April 28 report that "[d]uring this time, it was reported to [Stice] that both the mother and the boyfriend had reached out to the youth, but the youth had not responded, and had shared the text messages with the care providers. The youth suffered from poor sleep and stomachaches during this time. It is not clear if these discomforts were due to the side effects of the medication [minor was taking] or the distress of her interactions with her mother."

On April 15, Stice spoke with minor's care providers who stated minor "had been more relaxed and was thriving, even during the COVID-19, shelter in place." But Stice also observed that minor "continues to show distress over the interactions with her mother and the mother's boyfriend back in February." Stice opined that mother had not made any changes that could liberalize visits with her daughter; rather, in "this report period, the mother has caused emotional damage to her child that will [] most likely affect her in some way over her lifetime." The Department, however, did not recommend a change in visitation, which remained supervised and one time per month. The Department recommended that the court continue the permanent placement living arrangement with a long-term plan of legal guardianship or adoption. Due to the state of emergency related to the COVID-19 pandemic, the section 366.3 review hearing was continued to June 26.

6

Two days prior to the review hearing, on June 24, minor's counsel filed a request to change the juvenile court's prior November 2019 order on visitation and requested termination of visitation between minor and mother. The request stated that minor has suffered and would continue to suffer emotional harm if visitation with mother were to continue. We shall refer to minor's request, as did the juvenile court, as the section 388 petition.[3]

Mother opposed the request to terminate visitation. The juvenile court ordered a hearing on minor's section 388 petition to occur on July 22.

On June 26, Stice signed an addendum report for the section 366.3 hearing then calendared for June 26 (June 26 report) that was later filed on July 21. The June 26 report elaborated on the February 7 "incident" described in the prior April 28 report. Stice reported that minor, mother, and mother's partner had a conversation about a neighbor's suicide that minor "found to be hurtful and shocking." Stice stated that "[a]ccording to the youth, the mother and she were communicating via text message, when the youth had a view the mother did not agree with, the mother began to persuade the youth into seeing her perspective, and when they did not agree the youth stated that her mother threatened to cease visitation with her." The June 26 report further stated that mother and mother's partner said "upsetting things," cursed her, called her names, and "their words caused her to feel badly about how she dresses, carries herself, and insinuated that the foster family is 'grooming' her for abuse." Stice stated, "[a]ccording to [minor], she immediately took her phone to 'her parents' as she was extremely upset." Minor said, "the text messages began to disappear from her screen, but the foster father was able to see some of them." After the foster father reached out to mother to ask her to

_____

[3] Section 388 provides in relevant part: "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made."

stop sending upsetting messages to her child, mother attacked the foster father with abusive statements.

In the June 26 report, Stice also wrote about her attempt to facilitate a Zoom video call between mother and minor in late May and early June. Stice said, on May 21, she "was made aware of a request by counsel to send a recorded video to [mother] due to [minor]'s continued request of no contact." The record is not clear which counsel made the request for the video. Minor "initially declined the request, then stated she would do a Zoom call to say what she needed to say." In early June, Stice reached out to mother about the Zoom visit and a meeting of June 1 was agreed to. However, the June 1 visit did not occur because, according to Stice, mother did not respond to Stice when Stice reached out to her on the morning of June 1 about the Zoom call.

The mother responded to Stice on June 3 but the communication "was too escalated for a productive conversation." After mother and her partner made various accusations against Stice, Stice provided mother with her supervisor's information to continue the scheduling efforts of the Zoom contact. It appears from the record that no Zoom call between mother and minor occurred.

According to Stice, "during a face to face contact" between Stice and minor on June 18, minor "expressed she had not desired any form of contact with her mother, video or otherwise." Stice stated that minor "has now acknowledged that any thought/communication with her mother has become upsetting to her" and minor "expressed the sense of calm she has felt since she decided to cease communication with her mother."

On July 22, based on the information provided to it, the juvenile court suspended visitation between mother and minor pending the next hearing on the section 388 petition seeking to terminate visitation, then scheduled for two days later. Minor, as well as her attorney, appeared at the hearing on July 22.

8

On July 24, the parties appeared for a hearing on a number of topics, including the section 388 petition and the Department's recommendation that the court set a section 366.26 hearing to determine a new permanent plan for minor. The matter was continued to allow mother to have sufficient time to review the June 26 report. Regarding the section 388 petition, mother's counsel stated mother was in opposition and that she intended to subpoena minor. The juvenile court set dates for trial and set deadlines for mother's counsel to serve minor and minor's anticipated motion to quash, among other discovery deadlines. It ordered that the section 366.3 hearing would occur after the section 388 hearing. The juvenile court ordered all contact between minor and mother suspended pending the section 388 hearing.

C. *Mother's Subpoena, Minor's Motion to Quash, and Juvenile Court's Ruling on Motion to Quash*

Prior to the section 388 petition hearing, mother's counsel served a subpoena seeking to compel minor's testimony at the hearing. On August 14, minor's counsel filed a motion to quash the subpoena, contending that compelling minor to testify would be detrimental to her psychological and emotional well-being. The motion to quash was accompanied by a memorandum of points and authorities that argued the juvenile court had authority to quash the subpoena for minor's appearance pursuant to section 350 and *In re Jennifer J.* (1992) 8 Cal.App.4th 1080 (*Jennifer J.*). Mother, through her counsel, filed a written opposition to the motion to quash. Mother argued that minor in fact "wants to speak to her mother in court" and that it was important for minor to have "the opportunity to testify and speak for herself." The Department took no position on minor's motion to quash.

On September 2, the juvenile court conducted a hearing on minor's motion to quash. Minor was present, as were her confidential caregivers and her attorney. After hearing argument from minor's counsel and mother's counsel, the juvenile court asked if the Department had a position. The Department responded that it was taking no position

9

on the issue of minor testifying. The juvenile court confirmed with minor's counsel that minor's and minor's counsel's positions were aligned in support of the motion to quash. Minor did not state that she had changed her position on the motion to quash. Minor then asked a question directly to the juvenile court related to, assuming she had to testify, the logistics of her testimony, which the juvenile court answered. Minor did not make any further statement or express to the court any desire or willingness to testify.

Following the statements made by minor and the attorneys, the juvenile court granted minor's motion to quash. Relying on the legal standard set forth in *Jennifer J.*, the juvenile court noted it had discretion to decline to require that minor testify. The juvenile court stated that "[i]n this case, I find that [minor]'s wishes can be presented without live testimony. Her position with respect to the motion to end visitation has been laid out in the social worker report and in the motion to quash the subpoena. And minor's counsel has specifically stated that those positions reflect not only minor's counsel's position as to what's in [minor]'s best interest, but also reflects [minor]'s stated interest."

The juvenile court further found that minor's testimony would not materially affect the issue of visitation. The juvenile court stated that "[t]he only relevant testimony she would have to offer is what her wish is with respect to visitation, something that we already know" and "[t]here is nothing in the papers to suggest that those wishes have changed." The juvenile court further noted that there was "nothing to suggest that mother would intend to undermine the credibility of [minor]" and that to the extent that mother was suggesting that the social worker's report may not be accurate, that social worker would be called and subject to cross-examination.

Regarding the issue of psychological harm to minor, the juvenile court found that there was evidence that requiring minor to testify would likely cause her psychological harm. The juvenile court stated, quoting minor's motion to quash, that the court reports are " 'replete with instances in which the mother has engaged in behaviors causing

10

[minor] significant emotional distress' " and that the "recent report states that [minor] now feels a sense of calm after having ended communication with the mother, and it would not be in her best interest to interrupt that by requiring her to testify, particularly where her –where her wishes are already known to the court."

D. *Department's September 28 Addendum Report*

Shortly prior to the contested hearing on September 30, the Department filed a second addendum report (September 28 addendum). Social worker Francis Sebastian authored the September 28 addendum. Sebastian principally reported on a recent contact between minor and mother's partner. Specifically, on September 24, Sebastian went to minor's home placement and learned that mother's partner had appeared unannounced at her foster home. Mother's partner provided minor with a gift that appeared to be a used makeup palette, sunglasses, and a small container containing food. Sebastian stated that it was concerning that mother and mother's partner knew where minor and her caregivers lived, as it was a confidential placement. Sebastian felt that mother's partner and mother were not respecting the order of the juvenile court.

E. *Contested Section 388 Hearing*

The juvenile court held a contested, combined hearing on minor's section 388 petition on September 30 and October 28. The juvenile court admitted into evidence the three most recent reports from the social worker (i.e. the April 28 report, the June 26 addendum, and the September 28 addendum). Mother did not object to the admission of the three reports. No other documentary evidence was marked or admitted into evidence at the hearing.

Minor, accompanied by her confidential caregivers and represented by counsel, was present at both days of the hearing.[4] On the first day of the section 388 hearing, minor's counsel stated that minor was submitting on the three reports. The Department

---

[4] Due to restrictions based on the COVID-19 pandemic, all parties appeared by video for both days of the hearing.

stated that it supported minor's petition to terminate visitation, and that the two social workers involved with minor's case, Stice and Sebastian, were available to testify. Mother's attorney called both Stice and Sebastian to testify.

Stice, the author of the April 28 report and the June 26 addendum, testified that she had worked for approximately two and half years on minor's dependency matter. Although minor had wanted more visitation with mother "in the beginning," Stice stated that in the "last year" minor had been "more consistent" in wanting less visitation with her mother. In Stice's view, minor was "very articulate, very in tune to her own emotions and how she feels about things." By the time Stice left her assignment to minor's case in June 2020, minor did not want contact with mother and minor was "pretty adamant" that she would not change her mind. In Stice's view, this was a major decision for minor, and minor had given it a lot of thought.

Stice also testified that she personally witnessed incidents where mother demeaned minor, including at child family team meetings. Stice stated she had viewed some disturbing text messages mother sent and was included on a group text in which mother expressed demeaning language towards minor. Stice stated that, while mother had made some inappropriate contacts previously, mother's inappropriate interactions with minor had "increased in intensity and style" in the past year.

Stice testified that visits with mother had negatively affected minor's emotional health, and Stice confirmed her statement in the June 26 addendum that communication with mother had become upsetting to minor. When mother's counsel questioned Stice about whether it would be detrimental to terminate "bonds and attachments," Stice responded that: "So I would say it has been more of an enmeshment than a healthy bond. And the relationship had been deteriorating, I think, as [minor] began to mature in the last year." Stice testified that, prior to the February 7 incident, there had been "some incidents of self-harm" by minor that were "attributed to just the—she and her mother's interactions, comments, conversations that were had."

12

Stice also testified about the February 7 incident where, according to Stice's April 28 report, mother had threatened to end visitation, engaged in guilt tactics, and (along with her partner) demeaned minor and continued to harass her during the following days. Stice stated that minor "had relayed that, you know, she was very disturbed by the text messages and interactions." She was "still very disturbed by it" when she later talked to Stice about "emotional safety."

Sebastian, who was the social worker who took over from Stice following her reassignment, testified about the recent incident in which mother's partner had appeared unannounced at the confidential foster placement and without court permission. Sebastian also testified that he was not aware of any interactions between mother and minor occurring in the approximately four-month period from when he began working on minor's case in late June until the present (September 30).

Mother's partner testified largely about his recent encounter at minor's foster home, which had occurred six days earlier, and his conversation with minor that day. Mother's partner had never really looked at the text messages that mother sent to minor and there were "at least a couple or three that I've maybe seen." While generally stating he had never demeaned minor, he did not testify that minor made any statement or indication that she wanted visitation or contact with mother.

Mother testified on the second and final day of the hearing. When questioned about her understanding of why the parties were at the hearing, mother stated she understood her "daughter had something that she wanted to tell me face-to-face from her lips" and that mother "need[s] to hear from [] my daughter that that is her wish" to discontinue visitation. Mother stated that she wanted to see her daughter "grow up" and that "[t]he way it is set up now . . . [minor] shuts down, and there's no time to talk with her about deep, meaningful things." Mother stated that it was important for her to hear minor testify because "I believe that they are lying and I believe that they are putting words in her mouth and I believe they are putting thoughts in her head and they are

13

creating their own narrative. They created a monster that they are trying to fill the britches for." She stated, "I don't believe them. I don't believe any of you. I want to hear from my daughter that she doesn't want to have contact with me anymore and I will go away. I will."

On cross-examination by minor's counsel, mother testified that she had used her partner's phone at times to communicate with minor and sent a link earlier that year to YouTube video called " 'To save America, Trump must initiate a new American revolution.' " She did not recall if that video contained images of white militia men.[5] She did not recall if she had used an application to communicate with minor that allowed messages to be deleted within 15 minutes. Mother was not currently using any mental health services.

F. *Juvenile Court's Ruling on Section 388 Petition and Setting of Section 366.26 Hearing*

Following the conclusion of testimony, the juvenile court ordered the parties to submit their closing arguments in writing. Mother, through her counsel, submitted written closing arguments and generally contested the section 388 petition to terminate visitation. Minor, through her attorney, submitted a rebuttal argument in support of minor's request to terminate visitation.

On November 9, the juvenile court issued a written decision finding that minor had satisfied her burden to show changed circumstances and granted her section 388 petition to terminate visitation. The juvenile court found that visitation between minor and her mother was detrimental to minor's well-being. Relying on Stice's testimony, the juvenile court found that mother's conduct towards minor became "increasingly inappropriate." The juvenile court also found that minor did not desire visitation with her mother. The juvenile court credited Stice's testimony that this change in minor's desire

---

[5] The record reflects that minor is "Caucasian and African American."

14

stemmed from minor's increasing maturity. According to the juvenile court, minor "now recognizes what the department, and this Court, has recognized for some time: namely, that despite the long and at times loving relationship between [minor] and her mother, continued contact with her mother has a detrimental effect on [minor]'s mental health." The juvenile court credited Stice's testimony that the mother-daughter relationship was " 'an enmeshment, more than a healthy bond.' " The juvenile court also found that minor had suffered emotional distress over her interactions with mother, including the February 2020 contact and that "[s]ince [minor] terminated contact after February, she has had no self-harm issues." The juvenile court further observed that minor's caregivers had reported minor was "more relaxed and has been thriving since contact was stopped."

Addressing mother's argument that minor was being "manipulated," the juvenile court stated that it disagreed. In the court's view, minor had made her feelings known to the social worker and to her counsel. Relying on *Jennifer J.,* the juvenile court concluded it was legally unnecessary for minor to testify about her wishes directly. The court further found that mother ignored the emotional toll it would take on minor to have to stand up in court to say she no longer wanted to see her mother.

The following day, the juvenile court held a hearing to confirm its ruling. Minor was present. The juvenile court terminated all visits with mother based on the court's detriment finding. The juvenile court set a section 366.26 hearing for March 2, 2021.

Mother timely filed a notice of intent to file a writ petition challenging the findings and orders made by the juvenile court on November 10.

## II. DISCUSSION

Mother contends insufficient evidence supports the juvenile court's order granting the section 388 petition and terminating her visitation and that the juvenile court erred in granting the motion to quash her subpoena for minor's testimony. In her writ petition, she requests that we "order the [juvenile] court to hold a new hearing allowing [minor] to

15

testify." Mother requests we stay the scheduled section 366.26 hearing until we have decided her writ petition.

The Department has filed a brief in this court arguing that the juvenile court properly terminated mother's visitation.[6] Minor, through her counsel, has separately filed a brief opposing each of mother's requests and addressing the juvenile court's ruling on the motion to quash. We turn first to the juvenile court's ruling granting minor's section 388 petition and terminating visitation.

A. *Juvenile Court's Ruling Granting Minor's Section 388 to End Visitation with Mother*

Mother asserts the juvenile court abused its discretion in granting the section 388 petition because insufficient evidence supports its detriment finding. The Department disagrees, asserting there is ample evidence to support that minor's "emotional well-being and safety would be harmed from ongoing visitation and contact with her Mother."

"The overarching goal of dependency proceedings is to safeguard the welfare of California's children." (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.) " 'There is no question but that the power to regulate visitation between minors determined to be dependent children [citation] and their parents rests in the judiciary.' [Citation.] As such, dependency law affords the juvenile court great discretion in deciding issues relating to parent-child visitation, which discretion we will not disturb on appeal unless the juvenile court has exceeded the bounds of reason." (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557–1558.)

Where, as here, a section 388 petition has been filed after reunification has ended and long-term foster care has been ordered, the juvenile court may terminate parental

---

[6] The Department also filed a letter brief stating that, consistent with its position to the juvenile court, it did not intend to take a position on the propriety of the juvenile court's order quashing mother's subpoena. The Department's opposition confirms that it does not take a position on the subpoena issue.

visitation if it finds by a preponderance of the evidence that visitation would be detrimental to the physical or emotional well-being of the child. (See *In re D.B.* (2013) 217 Cal.App.4th 1080, 1089–1090.) In *D.B.*, the First District Court of Appeal, Division 4, affirmed a juvenile court's order that terminated parental visitation based on new evidence that the children had "continued negative responses to visits with both mother and father." (*Id.* at pp. 1093–1094.) The court noted that "[a]lthough we recognize that the visits included some positive interaction between the boys and the parents, we cannot say, in light of all the evidence, that the juvenile court's order terminating further visits exceeded the bounds of reason." (*Id.* at p. 1094.)

Regarding the finding of detriment, as "several courts have acknowledged, the notion of detriment is at best a nebulous standard that depends on the context of the inquiry," but " '[i]t cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' Rather, the risk of detriment must be substantial, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1490, italics omitted.)

In this writ proceeding, we review the record to determine whether substantial evidence supports the juvenile court's finding of detriment. (*Georgeanne G. v. Superior Court of Los Angeles County* (2020) 53 Cal.App.5th 856, 864; see also *In re Daniel C.H.* (1990) 220 Cal.App.3d 814, 838–839 [reviewing no visitation order for sufficiency of the evidence and affirming order].) "Substantial evidence is that which is reasonable, credible and of solid value." (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238.) "When an appellate court reviews a sufficiency of the evidence challenge, we may look only at whether there is any evidence, contradicted or uncontradicted, which would support the trier of fact's conclusion. We must resolve all conflicts in favor of the court's determination, and indulge all legitimate inferences to uphold the court's order.

17

Additionally, we may not substitute our deductions for those of the trier of fact." (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212.) "If there is substantial evidence to support the findings of the juvenile court, we uphold those findings." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Having carefully reviewed the record and applying the relevant presumptions, we conclude ample substantial evidence supports the juvenile court's finding that further visitation with mother would be detrimental to minor's emotional well-being. The April 28 report and Stice's testimony reflect that minor was deeply upset by mother's actions, notably mother's (and mother's partner's) negative statements about minor and mother's bombardment of minor with calls and text messages, including a disturbing text message where mother insulted a person who had committed suicide. As stated by Stice in the April 28 report, the minor has "experienced suicidal ideation in the past and the discussion was disturbing to all involved." A few months later, in the June 26 addendum, Stice stated that minor "has now acknowledged that *any thought/communication* with her mother has become upsetting to her" (italics added) and minor "expressed the sense of calm she has felt since she decided to cease communication with her mother". The record thus reflects an extended sequence of conduct by mother upsetting to minor, and evidence that minor's mental state improved when minor shielded herself from such conduct. Mother's view of the evidence as simply involving "one unfortunate text message exchange," or her apparent suggestion that her daughter changed her mind to no visitation simply because of a "failed [Z]oom call" is not supported by the record. We furthermore may not reweigh the evidence that was before the juvenile court.

We acknowledge that the record establishes mother loves her daughter and wants to continue to visit with her. However, the record also contains substantial evidence that mother's contacts with minor caused minor to suffer emotional distress, that the nature of mother's contacts with minor became increasingly upsetting for minor, and at least one contact necessitated involvement by her care team and implementation of a safety plan.

18

We conclude that the juvenile court did not abuse its discretion in its decision to grant minor's section 388 petition.

B. *Juvenile Court's Ruling Granting Minor's Motion to Quash*

Mother's writ petition also challenges the juvenile court's ruling granting minor's motion to quash, which precluded mother from forcing minor to testify at the section 388 hearing. Mother contends that the juvenile court had no authority to quash mother's subpoena to have minor testify at the section 388 hearing. Mother further claims that the juvenile court's ruling was not supported by substantial evidence and violated her constitutional due process right to call minor as a witness.

We first address the question of the juvenile court's authority to preclude mother from presenting minor's testimony, an issue we review de novo. (See *Conservatorship of Kane* (2006) 137 Cal.App.4th 400, 405.) We conclude the juvenile court had the authority to do so under the longstanding precedent of *Jennifer J.*[7] *Jennifer J.* held that a juvenile court has discretion to refuse to order the testimony of a child in order to avoid psychological harm to the child when certain circumstances are present. (*Jennifer J.*, *supra*, 8 Cal.App.4th at p. 1089.) In particular, the Fourth District Court of Appeal, Division 1, stated in *Jennifer J.* that, "[w]here []the child's desires and wishes can be directly presented without live testimony, where the issues to be resolved would not be materially affected by the child's testimony, and where it is shown that the child would be psychologically damaged by being required to testify, we hold the juvenile court judge has the power to exclude such testimony." (*Ibid.*) In support of its holding in *Jennifer J.*, the Court of Appeal stated that the power of the juvenile court to refuse to require the testimony of the child subject to the litigation "derives . . . from a recognition of the overriding objective of the dependency hearing—to preserve and promote the best

_____

[7] Mother argues here that we should disregard the decision in *Jennifer J.* Minor's counsel asserts that mother forfeited her argument. Even assuming without deciding that mother did not forfeit the issue, we decline mother's invitation to do so.

19

interests of the child. It would be a perversion of the procedure to impose upon it a requirement that the child's testimony *always* be presented, regardless of the trauma resulting to the child therefrom, and regardless of the necessity of such testimony in the resolution of the issues before the court." (*Ibid.*; see also *In re Daniela G.* (2018) 23 Cal.App.5th 1083, 1092 (*Daniela G.*) [discussing and applying *Jennifer J.*]) Given this precedent, we are not persuaded that the juvenile court lacked authority as a matter of law to refuse to require minor to testify at the section 388 hearing.

Mother also claims that the juvenile court has "no statutory authority to quash a subpoena for a minor who is available and competent to testify" and that section 350 (a statute relied upon by minor's counsel in her briefing in the juvenile court) provides no such authority.[8] As an initial matter, we do not understand the juvenile court to have relied on section 350 for its decision; rather, it specifically relied on its inherent authority to preserve and promote the best interests of the child, as articulated in *Jennifer J.* Moreover, mother does not point to any statute that prohibited the juvenile court from excluding minor's testimony in the section 388 hearing.[9] We therefore reject mother's argument that the juvenile court lacked the authority to grant minor's motion to quash.

Mother also claims the juvenile court abused its discretion because substantial evidence does not support the juvenile court's factual findings required under *Jennifer J.* She further contends that her due process rights were violated by not having the opportunity to have her daughter testify at the section 388 hearing.[10] Minor's counsel

---

[8] Pertinent here, section 350 includes provisions that relate to a juvenile court's obligations to control all proceedings, as well as the circumstances when the testimony of a minor may be taken in chambers and outside the presence of the minor's parent or parents. (§ 350, subds. (a)(1), (b).)

[9] Mother generally discusses Evidence Code sections 240 and 765, but neither of those statutes precludes the juvenile court from excluding a child's testimony in a dependency matter.

[10] Mother's petition also contains a heading stating "[g]iven the evidence, it was an abuse of discretion for the juvenile court to entirely exclude [minor]'s testimony

20

argues that, even if error occurred in this case, any error was harmless and mother has failed to meet her burden to demonstrate actual prejudice.

"The harmless error analysis applies in juvenile dependency proceedings even where the error is of constitutional dimension." (*In re J.P.* (2017) 15 Cal.App.5th 789, 798.) We may only reverse the juvenile court's ruling if we conclude that it is " 'reasonably probable the result would have been more favorable to the appealing party but for the error.' " (*Ibid.* [quoting *In re Celine R.* (2003) 31 Cal.4th 45, 60].) "[E]rrors in civil trials require that we examine 'each individual case to determine whether prejudice actually occurred in light of the entire record.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801–802.)

Having reviewed the record on appeal, we conclude that it is not reasonably probable that mother would have obtained a more favorable result had the juvenile court allowed mother to compel minor to testify at the section 388 hearing. Mother has not explained how a different ruling on the issue of minor's testimony would have led to a more favorable result.

Mother asserts that she "wished to clarify the claims made within those [social worker's] reports and to explore [minor]'s wishes and ensure that [minor] had all of the necessary information to make this decision." Mother had adequate opportunity to clarify the reports in cross-examination of the social workers at the hearing. Mother also does not explain how clarifying or exploring any of these topics would have changed the result here, and therefore she has not established prejudicial error in the juvenile court's ruling.

opposed to allowing her to testify in chambers or an adequate equivalent given the restraints due to the COVID-19 pandemic" (some capitalization omitted). Minor's counsel argues this contention was forfeited because mother failed to make this request with the juvenile court. Based on our review of the record, we agree and therefore do not reach its merits. (See *In re S.B.*(2004) 32 Cal.4th 1287; *Daniela G.*, *supra*, 23 Cal.App.5th at p. 1090 [father forfeited argument that juvenile court was required to consider having children testify in chambers].)

## III.  DISPOSITION

The petition for extraordinary writ is denied.  Mother's request for a stay is denied. This decision shall be final immediately upon filing.  (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

_____
                                 Danner, J.

WE CONCUR:

_____
Greenwood, P.J.

_____
Grover, J.

**H048611**
*K.M. v. Superior Court*